**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



*Mary Ann Whipple*
*United States Bankruptcy Judge*

**Dated: March 12 2021**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 18-33456 |
| | ) | |
| Mark W. Klinger | ) | Chapter 7 |
| | ) | |
| Debtor(s). | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER REGARDING MOTION TO DISMISS

    This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtor's Chapter 7 case for abuse under 11 U.S.C. §§ 707(b)(1) and (b)(3) [Doc. # 72] and Debtor's objection [Doc. # 75]. The court scheduled this matter for an in-person evidentiary hearing, subject to re-evaluation in light of the ongoing COVID public health emergency. [Doc. # 73]. A supplemental procedures order issued converting the in-person hearing to a virtual hearing. [Doc. # 77]. The parties filed and the court approved the Joint Request of the United States Trustee and Debtor to Dispense with the Evidentiary Hearing, File Stipulation of Facts, Stipulate to Admission of Exhibits, and Have the Court Decide the Matter upon Briefs. [Doc. ## 79 and 80]. As a result of the Joint Request, the parties filed an Amended Document Stipulation. [Doc. # 83]. In accordance with the deadlines set forth in the order approving the Joint Request, the UST filed a supplemental brief. [Doc. # 84].

    The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of

reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss under § 707(b) are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the briefs and the evidence presented, and having reviewed the entire record in this case, the court will grant the UST's motion to dismiss for the following reasons, which constitute the court's findings of facts and conclusions of law. Fed. R. Bankr. P. 9014(c); Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52(a).

## BACKGROUND

Debtor is a production manager for Estabrook Assembly Service in Berea, Ohio where he has been employed for three decades. [Am. Stip. Fact 2]. Debtor is divorced and has no dependents. Debtor filed his voluntary Chapter 7 petition on November 3, 2018, with primarily consumer debts. [UST Ex. 2; Am. Stip. Fact 1]. At the time the petition was filed, Debtor's Schedule I and J showed net monthly income of $2,164.92 and expenses of $4,314.50, resulting in an apparent monthly spending deficit of $2,149.58. [UST Ex. 2, pp. (2-45)–(2-48); Am. Stip. Fact 3]. Schedule D shows total secured debt of $193,800, including $168,998 secured by Debtor's home in Lakeside Marblehead, Ohio and a $24,802 home equity loan also secured by his home. [*Id.* at pp. (2-37)–(2-38)]. Debtor's petition at Schedule E/F lists nonpriority debts totaling $25,542.35. [*Id.* at pp. (2-39)–(2-42)]. The unsecured nonpriority debt consists primarily of credit card and charge account debt. Debtor's Statement of Financial Affairs lists his gross income for 2018 at $50,625.12 as of the date the petition was filed. [*Id.* at p. (2-50)]. It also lists his gross income to have been $117,172.00 for 2017 and $116,065.20 for 2016. [*Id.* at p. (2-51)].

Debtor's Official Form 122A-1, at part 2, determines whether the means test applies. It shows that Debtor's annualized current monthly income at the time of filing this case was $61,529.04. [UST Ex. 2, p. (2-11)]. The median income in Ohio in 2018 for a family the size of Debtor's family (one) was $48,441.00, requiring application of the means test. Debtor's Official Form 122A-2, the means test calculation, determined there was no presumption of abuse. [*Id.* at pp. (2-12)–(2-19)].

At the December 13, 2018, Meeting of Creditors, upon inquiry from the Chapter 7 Trustee, Debtor explained that he had received bonuses from his employer in the past, had not received a bonus for 2018 and had no expectation of a bonus for 2018. Post-petition, Debtor received a $50,000 2018 bonus from his employer [Am. Stip. Fact 14] translating to a net payment after taxes of $32,425.00 [UST Ex. 10, p. (10-2)]. In March 2019, the Chapter 7 Trustee moved for turnover of Debtor's net 2018 end of year bonus as property of the estate. Following an evidentiary hearing and briefing on the Chapter Trustee's motion,

2

the court denied the motion for turnover. [UST Ex. 10]. Following that decision, the Chapter 7 Trustee filed a "no asset" report indicating there was no property available for distribution from the estate to Debtor's unsecured creditors. [Doc. # 69].

On April 28, 2020, the UST moved to dismiss Debtor's petition for abuse under 11 U.S.C. § 707(b)(1) and (b)(3).

## LAW AND ANALYSIS

Where debts are primarily consumer debts, the court may, after notice and hearing, dismiss a Chapter 7 case "if its finds that the granting of relief would be an abuse of provisions [Chapter 7]." 11 U.S.C. § 707(b)(1). The purpose of this policy is to require debtors with the ability to pay their debts to pay all or a portion of their debts and not use Chapter 7 to escape those liabilities. *In re Jacob*, 447 B.R. 535, 539 (Bankr. N.D. Ohio 2010) (citation omitted). Under § 707(b)(2) and (3), Congress provided two methods by which abuse may be proven. Section 707(b) was enacted by Congress as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Section 707(b)(2)(A) sets forth an extensive "means test" calculation to determine whether there is a presumption of abuse. The second method, under § 707(b)(3), requires the court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." The UST's motion relies on this second basis for dismissal.

Before BAPCPA, courts considered dismissals for "substantial abuse" under § 707(b) based upon "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). As noted by the Sixth Circuit:

> In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is "needy" in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. *See* 4 Collier, supra, ¶ 707.07, at 707–20. Substantial abuse can be predicated upon either lack of honesty or want of need.

*In re Krohn*, 866 F.3d at 126. Congress incorporated this judicially created construct in § 707(b)(3). While pre-BAPCPA case law applying these concepts remains helpful in determining abuse under § 707(b)(3), under BAPCPA Congress lowered the standard for dismissal from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

The UST does not contend that Debtor filed his Chapter 7 petition in bad faith. Instead, the UST argues that the totality of the circumstances of Debtor's case demonstrates an ability to repay his creditors as he has disposable income available to make a meaningful payment to them. Under a totality of the circumstances test, the court determines whether a debtor is "needy" and whether "his financial predicament warrants the discharge of his debts" in a Chapter 7 case. *See Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). The plain meaning of § 707(b)(3)(B)'s reference to "debtor's financial situation" includes a debtor's actual income and expenses, since such information is the starting point for any analysis of an individual's situation. *In re Mestemaker*, 359 B.R. at 854. In making this determination, the court may consider both prepetition and post-petition circumstances, including the debtor's financial circumstances as they existed at the time the motion was heard. *In re Goble*, 401 B.R. 261, 276 (Bankr. S.D. Ohio 2009). To facilitate this inquiry, Debtor submitted updated Schedules I and J to the UST to show his actual financial situation in 2020. [UST Ex. 11; Am. Stip. Facts 5 and 6].

Factors relevant to determination of the totality of the circumstances include the ability to repay debts out of future earnings, which alone may be sufficient under some circumstances to warrant dismissal. *See In re Krohn*, 886 F.2d at 126. Other factors considered are "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27.

As the movant, the UST bears the overall burden of demonstrating, by a preponderance of the evidence, that Debtor's case should be dismissed. *In re Weixel*, 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013).

The issues targeted by the UST in this case under the totality of the circumstance test are: (1) Debtor's voluntary contributions to his 401(k) plan at Estabrook; (2) Debtor's history of earning end of year bonuses and understated income in general; (3) Debtor's excessive expenses, especially a current food and housekeeping supplies budget of $900/month; (4) known imminent reductions in Debtor's obligations to his former spouse; (5) the timing of Debtor's filing; and (6) Debtor's ongoing preference of at least one general unsecured creditor. The court would also add material inaccuracies in Debtor's schedules, which impact the foregoing issues.

A, **Ability to Pay**

One component of assessing a debtor's ability to pay considers whether there is sufficient income in light of actual necessary expenses to fund a Chapter 13 plan. *In re Tucker*, 389 B.R. 535, 538 (Bankr. N.D. Ohio 2008) (citations omitted); *see In re Behlke,* 358 F.3d at 435. In making the assessment of disposable income available to a debtor, the court as the trier-of-fact may impute income when it is equitable to do so and make downward adjustments in expenses where it is determined those expenses are not reasonably necessary for the support of a debtor. *In re Hoke*, 447 B.R. 835, 837-38 (Bankr. N.D. Ohio 2011).

1. <u>The Income Side</u>
    a. <u>Retirement Plan Contributions</u>

The UST seeks to add back and impute as monthly income Debtor's contributions to a retirement plan that are deducted from his pay.

The initial question is whether the contributions shown on Debtor's Schedule I as deductions from his pay are voluntary, as the UST asserts, or mandatory. Debtor lists them as mandatory on his original and updated Schedules I. [Am. Stip. Facts 3 and 5; UST Ex. 11]. However, Box 12a on the Forms W-2 included with his income tax returns for tax years 2018 and 2019 [UST Exs. 5-6][1] show that the contributions are "elective," which the court construes as synonymous with "voluntary" and not mandatory. And the parties have so stipulated. [Am. Stip. Facts 8 and 10; UST Ex. 11]. The court sees no basis upon which these contributions can be construed as mandatory in nature despite Debtor's characterization of them to the contrary on his Schedules I. The court finds the W-2s issued by his employer for income tax purposes more reliable and persuasive than Debtor's schedules. Accordingly, the court finds that Debtor is voluntarily making contributions to a 401(k) plan at Estabrook, and that he has increased those contributions since filing his petition, from $337 per month to at least $415 per month as shown by comparing his original and updated Schedules I.

This court has previously rejected the notion that voluntary contributions to retirement accounts are never reasonably necessary expenses in a § 707(b)(3)(B) analysis. *See In re Tucker*, 389 B.R. at 540. Rather, a totality of the debtor's individual circumstances must be considered in determining whether a debtor's 401(k) plan contributions and/or repayment of 401(k) plan loans are reasonably necessary expenses. *Id.* at 540-41 (citing *In re Behlke* 358 F.3d at 435-36 (holding that voluntary contributions to a 401(k) retirement plan were "disposable income" in substantial abuse analysis)); *see In re Beckerman*,

---
[1] The W-2s supporting Debtor's 2017 income tax returns are not included.

381 B.R. 841, 848-49 (Bankr. E.D. Mich. 2008); *In re Gonzalez*, 378 B.R. 168, 174 (Bankr. N.D. Ohio 2007). This court has decided that debtors may seek relief under Chapter 7 while voluntarily saving for retirement or repaying a 401(k) loan if such savings or repayment appear reasonably necessary for the maintenance or support of a debtor or his dependents. *In re Tucker*, 389 B.R. at 540. Factors relevant to this determination include: (1) the debtor's age and time left until retirement; (2) the amount of debtor's existing retirement savings; (3) level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) needs of any dependents; and (7) other constraints that make it likely that retirement contributions are reasonably necessary expenses for this particular debtor. *Beckerman*, 381 B.R. at 848 (citing *Hebbring v. U.S. Trustee*, 463 U.S. 902, 907 (9th Cir. 2006) (citing *In re Taylor*, 243 F.3d 124, 129-30 (2d Cir. 2001)); *In re Ng*, 477 B.R. 118, 127 (B.A.P. 9th Cir. 2012) (citing *Hebbring*).

According to his 2018 W-2, Debtor contributed $4,049 to his 401(k), or the $337 per month listed on his Schedule I. [UST Ex. 6, pp. (6-1)]. In 2019, Debtor contributed $7,556 to his 401(k), [UST Ex. 5, pp. 5-38)], or $630 per month. That amount is substantially more than the amount Debtor listed on his original Schedule I. As of June 2020, he had contributed $2,700 to his 401(k) in 2020, or $450 per month when calculated by dividing $2,700 by 6 months. [UST Ex. 4, p. (4-2)]. Debtor's updated Schedule I lists his 401(k) contribution as $415 per month. [UST Ex. 11, p. (11-3)].

In his objection to the UST's motion, Debtor states he "had to transfer $50,000 out of his $85,000 retirement to his ex-wife as part of his 2011 divorce." [Doc. # 75, p. 1]. Debtor's petition, however, indicates no retirement or pension accounts whatsoever. [UST Ex. 2, p. (2-32)]. The divorce decree with his former spouse addresses division of his retirement accounts. [UST Ex. 9, p. (9-9)]. It specifies that there are two retirement plans in which Debtor had an interest at the time of the divorce, the 401(k) through Estabrook, which he then valued at $86,848.82, and a pension plan through BASF, which he then valued at "$44,000 plus." [*Id.*]. Under the decree, "husband shall transfer one-half (1/2) interest in all of his retirement plans to wife by the time of the hearing." [*Id.*].

It is clear from the record that Debtor's interest in the Estabrook 401(k) plan continues to exist, notwithstanding his failure to schedule it and provide on his schedules information as to its updated total value. Regardless of what happened in years 2012 through 2018, the record shows that he made contributions to it in 2018, 2019 and 2020. He contributes approximately 6% of his pre-bonus wages. For the calendar years 2018-2020 alone, the record supports a finding that he contributed at least $17,000 to

6

the Estabrook 401(k) plan ($4,049 in 2018, $7,556 in 2019 and $5,400 on an annualized basis in 2020). The court finds that Debtor had at filing and continues to have an interest in the Estabrook 401(k) plan.

In 2017 and 2019, the record shows that Debtor took taxable distributions from an undisclosed pension or annuity account held at Principal Life Insurance Co. in the amounts of $17,000 and $14,000 respectively. [UST Ex. 7, pp. (7-1) (line 16b) and (7-7); UST Ex. 5, pp. (5-1) and (5-29)]. The source of the Principal Life Insurance Co. account is otherwise unknown on the record, whether it is the Estabrook 401(k), another account not reflected on Debtor's schedules or his interest in or from the BASF retirement plan. Nor is it known on the record what he did with these funds.

Apart from the reference in the divorce decree to the BASF pension plan, the record is otherwise silent as to it. The court can make no inference from the record about its existence or status when Debtor filed his petition or at the time of the hearing on the UST's motion.

The record shows another source of income that, according to his schedules, was not being received at filing. The divorce decree shows that not only were his retirement assets and account split up at the divorce, but he becomes entitled to collect one-half of his former spouse's monthly $500 retirement benefit, or $250 per month, for 5 years when she begins to draw on it. [UST Ex. 9, p. (9-10)]. The status of her draw is unknown, and whether he has received any or all of the monthly payments from her on account of this provision of the divorce decree, is also unknown on the record.

It is also clear from the record that Debtor will be entitled to collect social security when he retires. Although his income did not exceed the social security wage base for those years, his 2017-2019 tax returns show that he is making substantial required contributions into the system through his payment of withholding taxes, $6,462.00 in 2017 [UST Ex. 7, p. (7-8)], $7,080.43 in 2018 [UST Ex. 6, p. (6-1)], and $7,071.66 in 2019 [UST Ex. 5, p. (5-38)]. The court finds that Debtor will have social security to support himself once he retires. The longer he holds off on doing so, the more his monthly benefit amount will increase.

Debtor's monthly obligations will decrease substantially in retirement. As will be discussed further below, Debtor's obligations to his former spouse under their divorce decree are about to reduce materially in 2020 and 2022, amounts he treats as expenses totaling $1,317 per month on his updated Schedule J. [UST Ex. 11, p. (11-5)(lines 18 and 19)]. And while Debtor turned 65 years old in June 2020, he supports only himself and has no dependents. The schedules also show that he has equity of approximately $46,180 in his Lakeside Marblehead home, which he valued at $239,480 at filing. [UST Ex. 2, p. (2-37)].

7

In his objection to the UST's motion, Debtor's counsel set forth certain information about Estabrook's business operations and asserts that he "may be forced to retire" if his employer fails to secure continuation of a contract with a certain client and "[a]t 65 years of age, his job prospects are limited." [Doc. # 75 at ¶ 8]. The assertion that Debtor may be forced to retire and his job prospects should he do so is speculative argument unsupported by the record. The court will disregard this argument.

The evidence clearly shows that, despite his failure to disclose it, Debtor has an interest in at least one retirement account, in which he has continued making contributions in an amount that escalated by as much at least $48 per month in 2020 and maybe more. The evidence shows that he will be entitled to draw social security benefits when he retires, and that he has no dependents. The record shows that he has been confident enough in his own prospects for income in retirement that he could make voluntary lumpsum taxable draws from some retirement account. The record shows that his monthly expenses will reduce substantially post-petition and into retirement because, at a minimum, his obligations to his former spouse drop off in 2020 and 2022. Also, as set forth below, some of his existing expenses are subject to reduction. The record shows that he has material equity in his home in Lakeside Marblehead. Based on all of these facts, the court finds that Debtor's continued monthly contributions to the Estabrook 401(k) plan are not reasonably necessary to build adequate (and further) resources for his support in retirement.

In response, Debtor argues that it makes no sense to consider his voluntary 401(k) contributions as part of the totality of the circumstances under § 707(b)(3) because they are excluded from consideration as disposable income under Chapter 13 pursuant to BAPCPA. His statement of the law on that point is correct insofar as Chapter 13. *In re Davis,* 960 F.3d 346, 355 (6th Cir. 2020). The court disagrees, however, that it follows from that proposition that it is inappropriate to consider those contributions under the totality of the circumstances standard of § 707(b)(3). *See In re Linton*, Case No. 19-33609, 2020 WL 7485687, *6, n.3 (Bankr. N.D. Ohio, December 15, 2020). For the following reasons, the court finds that a debtor's voluntary 401(k) plan contributions may be considered in evaluating a debtor's ability to pay under a § 707(b)(3) totality of circumstances analysis.

First, under § 707(b) there is no allowance or consideration of contributions to retirement plans. Prior to enactment in BAPCPA of a statutory exclusion of 401(k) loan repayments from disposable income under Chapter 13, courts did consider voluntary retirement plan contributions and 401(k) loan repayments as part of a debtor's overall financial circumstances under § 707(b). *In re Pandl*, 407 B.R. 299 (Bankr. S.D. Ohio 2009); *In re Felske*, 385 B.R. 649 (Bankr. N.D. Ohio 2008). *Contra In re Phillips*, 417 B.R. 30

(Bankr. S.D. 2009). In the court's view, the Sixth Circuit's decision in *Davis* does not prevent this court from considering voluntary contributions under § 707(b)(3).

Second, a debtor's ability to fund a hypothetical Chapter 13 plan is but one consideration under a § 707(b)(3) analysis of the totality of the circumstances. *See In re Krohn*, 886 F.2d at 126 (inability of a debtor to qualify for Chapter 13 relief not dispositive of abuse of Chapter 7); *In re Meehean*, 619 B.R. 371, 379 (E.D. Mich. Aug. 18, 2020), *affirming* 611 B.R. 574 (Bankr. E.D. Mich. Jan. 27, 2020). The court cannot compel a debtor to file or convert to Chapter 13. A determination that it would be an abuse to obtain a Chapter 7 discharge under the totality of the circumstance does not mandate conversion to Chapter 13. Should a debtor choose, however, to convert to or file a Chapter 13 case, he can choose how to fund a Chapter 13 plan out of whatever income stream or assets are available. Not infrequently, Chapter 13 debtors access funds in retirement plans to pay them into a Chapter 13 plan, even though that access to plan funds could not otherwise be compelled by the court. *See* 11 U.S.C. § 541(b)(7).

Likewise, in analogous contexts, bankruptcy courts in the Sixth Circuit have considered income amounts that a debtor cannot be compelled to use for repayment of creditors under a Chapter 13 plan in determining abuse of Chapter 7. *See In re Meehean*, 611 B.R. at 585 (although Social Security benefits cannot be considered in calculating a Chapter 13 debtor's "projected disposable income," they can be considered when determining income and abuse under §707(b)(3)), *aff'd* 619 B.R. at 379-80). *But cf. In re Suttice,* 487 B.R. 245 B.R. 245, 253-255 (Bankr. C.D. Cal. 2013) (court declines to consider social security benefits to determine abuse because debtors could not be compelled to fund a Chapter 13 plan with them, but also notes that debtors may do so voluntarily). The court does not see anything in *Davis* that changes the bankruptcy and district courts' analyses in *Meehean*.

Third, the record in this case shows that Debtor's voluntary 401(k) plan contributions amounts have fluctuated substantially. He has also drawn on other, unknown retirement assets as shown by his income tax returns for 2017 and 2019.

Finally, the court notes that the Sixth Circuit's majority opinion in *Davis* explicitly cautioned debtors that, while it will not treat voluntary 401(k) plan contributions as disposable income under Chapter 13, "[o]ur holding should not be read to curtail the good-faith analysis required by § 1325(a)(3)." *In re Davis*, 960 F.3d at 358; *see In re Meehean*, 611 B.R. at 592, 619 B.R. at 379-80.

In summary, the court finds that: (1) Debtor's contributions to the Estabrook 401(k) plan shown on his original and updated Schedules I and his 2017-2019 income tax returns are voluntary, not

mandatory; (2) under all of the circumstances discussed above, those contributions are not reasonably necessary expenses and deductions from his monthly income; and (3) it is appropriate in the context of § 707(b)(3) to consider those voluntary contributions and their reasonable necessity even though, in the Sixth Circuit under *Davis*, they are not disposable income in a Chapter 13 case. The court finds that Debtor's ongoing 401(k) plan contributions should be imputed as additional income for purposes of considering abuse under § 707(b)(3). This factor supports dismissal.

b. <u>Year-end Bonuses</u>

The UST argues that Debtor's end-of-the year bonuses should be considered on the income side in determining his ability to pay even though the court decided that his 2018 end of year bonus was not property of the Chapter 7 estate. [UST. Ex. 10]. Debtor argues that the annual bonuses cover the substantial monthly shortfall of his ordinary monthly salary income over expenses, and thus should not be considered by the court. The court agrees with the UST, and as will be addressed further, Debtor's monthly budget shortfall is overstated on his Schedules I and J.

While the bonuses received by Debtor over the years did not translate into a vested contingent property right making his 2018 bonus property of the bankruptcy estate, the record shows an unmistakable and uninterrupted pattern that the court cannot ignore in this different legal and procedural context. Debtor received end of year bonuses from his employer every year from 2009 through 2019. Those bonuses ranged from $21,000 to $50,000. The two most recent bonuses, received in 2019 and 2020, were both $50,000. Where there is a history of consistent year-end bonuses, as there is here, courts have considered those bonuses in assessing a debtor's disposable income. *In re White*, Case No. 15-30295, 2015 WL 6733878 (Bankr. N.D. Ohio 2015) (debtor's annual bonus received for 5 consecutive years was considered in assessing disposable income for § 707(b)(3) analysis); *In re Coates*, Case No. 10-41555 MER, 2011 WL 5419676 (Bankr. D. Colo. 2011) (given debtor's consistent receipt of bonuses, court factored in the annual bonus debtor received for the last six years in assessing disposable income for § 707(b)(3) analysis); *In re Jacob*, 447 B.R. 535, 544 (Bankr. N.D. Ohio 2010) (debtor's regular year-end bonuses, while not guaranteed, were appropriate for assessing disposable income). *But see In re Campbell,* Case No. 15-13426-BFK, 2016 WL 4150663 *14 (Bankr. E.D. Va. 2016) (bonuses received in three of the last five years were deemed insufficiently reliable to be included in assessing disposable income for purposes of § 707(b)(3) motion). In the context of a hypothetical Chapter 13 case, Debtor's prospective bonus amounts would be includable in projected disposable income as a change in income "known or virtually

10

18-33456-maw    Doc 86    FILED 03/12/21    ENTERED 03/12/21 14:37:43    Page 10 of 20

certain at the time of confirmation." *See Hamilton v. Lanning*, 560 U.S. 505, 524 (2010); *In re Rivera*, Case No. 8:19-bk-08490-RCT, 2020 WL 7333588 (Bankr. M.D. Fla. 2020) (Chapter 13 Trustee met burden of establishing that debtor's history of receiving bonuses from 2016 to 2020 were "known or virtually certain to occur" in the future and should have been included in proposed Chapter 13 plan); *cf. In re Seafort*, 669 F.3d 662 (6th Cir. 2012) (income made available after retirement plan loans are fully repaid during Chapter 13 case is "projected disposable income" that must be contributed to Chapter 13 plan, not redirected to make voluntary plan contributions). *But cf. In re Styerwalt*, 610 B.R. 356 (Bankr. D. Colo. 2019)(variable fact and amount of prior bonuses received by debtor over 4 year period before filing Chapter 13 case did not mandate their inclusion in proposed plan as projected disposable income amounts "known or virtually certain to occur").

Debtor's long, uninterrupted history of receiving end of year bonuses from Estabrook favors dismissal of this case.

c. <u>Overstatement of Deductions for Monthly Tax Withholding on Debtor's Schedules I and J</u>

On Debtor's means test Form 122A-2 and original Schedule I, he shows monthly gross wages of $5,127.42. [UST Ex. 2, pp. (2-11)-(2-12) and (2-45)-(2-46)]. On his updated Schedule I, he shows monthly gross wages of $5,192.32. [UST EX. 11, p. (11-3)].

The means test amount is based on the average monthly employment income Debtor received during the full 6-month period before he filed his Chapter 7 case. If income varies during those six months, Form 122A-2 requires a debtor to add all employment income during that period, divide by six and then multiply by 12 to determine annual monthly income. [UST Ex. 2, p. (2-10)–(2-11)].

In contrast, Schedule I requires a debtor to estimate monthly income "as of the date you file this form." [UST Ex. 2, pp. (2-45)–(2-46); UST Ex. 11, pp. (11-2)-(11-3) (updated Schedule I)]. The $5,127.42 and $5,192.32 amounts are generally confirmed as Debtor's salary by the relevant pay advices in the record. [*See* UST Exs. 3 (pay advices filed in case at commencement) and 4 (pay advices from January 2020 through June 2020)].

Multiplied by 12, those monthly salary amounts translate to an annual income of approximately $61,529 in 2018 and $62,307 in 2020. As Debtor's income tax returns [UST Exs. 5, 6 and 7], Statement of Financial Affairs [UST Ex. 2, p. (2-51)] and pay advices [UST. Exs. 3, 4] show, the $5,127.42 per month and $5,192.32 per month do not include any amounts received as a bonus. [Am. Stip. Facts 3 and 5]. Nor, based on the instructions, was Debtor required to include the bonus amounts on the means test

11

form or Schedule I. The means test shows that Debtor had income at filing, even without considering any bonus, substantially more than the median income for a household size of one in Ohio.

Against monthly salary income of $5,127.42, Debtor subtracts on his means test form and original Schedule I the amount of $2,345.15 per month on account of Tax, Medicare and Social Security Deductions. [UST Ex. 2, pp. (2-16), (2-46)]. Against monthly salary income of $5,192.32, Debtor subtracts on his updated Schedule I the amount of $1,748.98 per month on account of Tax, Medicare and Social Security Deductions. [UST Ex. 11, p. (11-3)]. The Schedule I deduction is to be based on estimated taxes at the time of filing. The means test deduction is for "[t]he total monthly amount you *actually* owe for federal, state and local taxes." [*See* UST Ex. 2, p. (2-16) (emphasis added)].

The problem is that Debtor's pay advices do not support this substantial a monthly deduction for taxes from his monthly salary income. Debtor calculated $2,345.15 as the appropriate monthly deduction amount for taxes on his Schedule I by adding up all of the withholding for all taxes in 2017 ($28,141, as shown on UST Ex. 7, p. (7-8)[2017 income tax returns]) and dividing that sum by 12. The court finds, however, that these deductions are materially more substantial than the monthly amounts that should be shown on Debtor's Schedules I at line 5a based on the actual monthly deductions from his pay at filing, and then again in January to June 2020. The $2,345 deduction on Schedule I instead reflects annual tax withholding arising in part from a lump sum bonus payment that is not correspondingly factored into the monthly salary income amounts on his Schedule I. [Am. Stip. Facts 3 and 5 (as to updated Sched. I)].

Debtor was required to file "all payment advices or other evidence of payment received within 60 days before the date of filing the petition…from any employer of the debtor." 11 U.S.C. § 521(a)(B)(iv). The 60-day period in Debtor's case covers September 4, 2018, through the filing date of November 3, 2018. UST Exhibit 3 is the pay advices Debtor filed at the commencement of the case in compliance with this requirement. UST Exhibit 4 is pay advices for the period January 2020 through June 2020.[2] Estabrook pays Debtor weekly in arrears.

The pre-petition pay advices required by the statute cover 9 paychecks (starting 9/7/18 [for hours worked from 8/26/18 to 9/1/18] to 11/2/18). [UST Ex. 3, p. (3-1)].

| Week | Date | Exhibit Page | Net Pay/Week | Total Taxes | Avg. Taxes/Week |
|---|---|---|---|---|---|
| 9 | 11/2/2018 | p. (3-9) | $924.74 | | |
| 8 | 10/26/2018 | p. (3-9) | $924.73 | | |

---

[2] The 2020 documents are in a different format than the 2018 documents and are easier to review and analyze.

12

| 7 | 10/19/2018 | p. (3-9) | $924.73 | | |
| 6 | 10/12/2018 | p. (3-9) | $924.74 | | |
| | | | $3,698.94 | $908.86 | $908.86/4 =$227.22 |
| 5 | 10/5/2018 | p. (3-5) | $924.73 | | |
| 4 | 9/28/2018 | p. (3-5) | $924.73 | | |
| 3 | 9/21/2018 | p. (3-5) | $924.73 | | |
| 2 | 9/14/2018 | p. (3-5) | $924.74 | | |
| 1 | 9/7/2018 | pp. (3-5), (3-1) | $924.73 | | |
| | | | $4,623.66 | $1,136.09 | $1,136.09/5=$227.22 |

The weekly net-pay and corresponding tax deductions for the 60 days preceding commencement of the case are consistent for the entire 9 weeks. The month before Debtor filed his case on November 3 includes 5 pay periods. If one calculates the proper monthly tax deduction amount for Debtor's Schedule I, line 5a, by that 5-week period, the correct deduction amount for Schedule I line 5a is the $1,136.09 total taxes withheld for the 5-week month, [UST EX. 2, p. (2-46)], not $2,345.15. Alternatively, if one calculates the proper tax deduction amount for Debtor's Schedule I, line 5a, by multiplying the weekly average tax deduction of $227.22 by 52, which is a total of $11,815.44, and then dividing that amount by 12 months, the monthly tax withholding amount for Schedule I, line 5a, is $984.62. Either way, whether the correct number for Debtor's Schedule I, line 5a, is $1,136.09 or $984.62, the amount is substantially less than the $2,345.15 that Debtor used to calculate his monthly net income on his Schedule J, line 23c. [UST Ex. 2, p. (2-48)]. The deduction on account of the correct tax withholding amount to reach that net should either be reduced by $1,360.53 ($2,345.15–$984.62=$1,360.53) or $1,209.06 ($2,345.15–$1,136.09=$1,209.06).[3] As a result, Debtor materially overstates his monthly Schedule I budget deficit

---

[3] Arguably the means test permits using apples and oranges figures in this way. The instructions for line 16 addressing taxes as "other necessary expenses" specifies designating "[t]he total monthly amount that you will actually owe for federal, state and local taxes." Debtor also includes on line 17 as an "other necessary expense" a deduction for $337.48 as an "involuntary deduction." But the court has decided that the contributions are voluntary, which are expressly not to be included, not mandatory, of $337.48 on line 17, [UST Ex. 2, p. (2-16)], for "mandatory retirement contributions." The court has decided above that those contributions are voluntary.

Had Debtor instead used on line 16 of the means test calculation, only actual monthly tax withholdings from his pay for the six-month period preceding the filing of this case and did not deduct his monthly 401(k) plan contributions on line 17, the case would have appeared to be subject to dismissal under § 707(b)(2) based on a presumption of abuse. However, there is an argument that the higher annualized deduction for payment of taxes, including those on the bonus amounts is correct, because it is based on Debtor's then-expected total tax liability for

13

because he is using apples figures for income (monthly salary excluding any annual bonus amounts) and oranges figures for expenses (total annual tax burden including on bonus payments).

For an apples to apples comparison on Schedules I and J, Debtor's 2017 bonus payment received in 2018 would also need to be prorated as income on a monthly basis as he has with his tax obligations including the bonus. While Debtor's 2018 federal income tax return lists gross wages of $110,172, [Am. Stip. Fact 9], the amount of the 2017 year-end bonus he received in 2018 is not clear. But if Debtor's gross wages for 2018 of $110,151 (including the bonus amount) are divided by 12, the result is $9,129/month. That amount, not the monthly salary amount of $5,127, would be an apples to apples budget comparison. Subtracting the annualized monthly tax obligation of $2,345 from $9,129 yields a monthly income of $6,784 on Schedule I, line 12 and a monthly net income surplus ($6,784 - $4,314 [Scheduled J expenses]) on Schedule J, line 23c of $2,470 instead of the monthly deficit of –$2,149 actually reported. [UST Ex. 2, pp. (2-46), (2-49)]. Even after subtracting an additional $417 as a monthly expense on account of the annualized $5,000 payment due to his former spouse until 2020, as Debtor does on his updated Schedule J, [UST Ex. 11, p. (11-5)], an apples to apples budget focusing on annualized income shows a clear ability to repay his creditors through a Chapter 13 plan or otherwise.

In summary, the court finds that Debtor's Schedule I and J budget calculation showing a substantial monthly budget deficit is wrong because the record shows that some of the taxes included as monthly deductions from his pay were actually deducted from the lump sums paid to him, not annualized. Using an accurate, apples to apples comparison of either actual monthly tax withholding from actual monthly salary or annualized tax obligation deductions from an annualized income figure shows that Debtor has an ability to repay his creditors. The UST postulates in his supporting brief that "[i]t is inconceivable to believe that Debtor's monthly expenses exceed his monthly net income by $2,136, which means either his income is understated, or his expenses are understated, or both." [Doc. # 84, p. 9]. The court agrees based on this issue alone.

---

2017, including on account of his bonus. Form 122-A2 directs deduction of "[t]he total monthly amounts that you will actually owe for federal, state and local taxes…." In that case, as shown, there might not be a presumption of abuse after all.

But the court need not figure all that out, for two reasons. First, the UST did not pursue dismissal on the basis of a presumption of abuse under § 707(b)(2). Second, even if Debtor's means test is correct, the court is not precluded from considering the totality of Debtor's actual financial circumstances and monthly budget under § 707(b)(3). Debtor's situation shows how and why § 707(b)(2) and § 707(b)(3) are both necessary and work in tandem under BAPCPA to effectuate the intent of Congress that debtors who can repay their creditors do pay them. *See Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 64 (2011).

14

2.      The Expense Side: Debtor's Other Monthly Expenses

On April 24, 2020, Debtor provided updated Schedules I and J to the UST. [Doc. # 83, p. 5, No. 11; Am. Stip. Facts 5 and 6]. Debtor's updated Schedule I reflects a gross monthly income of $5,192.32 and a net of $2,753.72. [UST Ex. 11, pp. (11-2)–(11-3); Am. Stip. Fact 6]. His updated Schedule J indicates monthly expenses of $4,890.26, resulting in an apparent spending deficit of $2,136.54. [UST Ex. 11, pp. (11-4)-(11-5); Am. Stip. Fact 6].

Debtor's expenses include a monthly mortgage payment of $1,339.43 and a home equity loan payment of $225.16. His utilities expenses are $181 for heat and electricity, $82 for water, sewer and garbage collection, and $315.75 for telecon services. All unremarkable. Debtor lists $900 a month for food and housekeeping supplies, but also indicates that he incurs no expenses for apparel, personal care items or other miscellaneous items. His transportation expenses are $216 per month, which will decrease in retirement. He lists a monthly alimony payment of $900 and a monthly payment of $416.67, resulting in an annual payment of $5,000 to his former spouse per their 2011 divorce decree. Debtor also lists monthly maintenance as to his real property of $225. Debtor's updated monthly expenses total $4,890.26, resulting in an apparent monthly spending deficit of $2,136.54.

Debtor is required by his 2011 separation agreement to pay his former spouse $900.00 a month through the end of 2022. [Am. Stip. Fact 20]. The separation agreement also requires Debtor to pay his former spouse either $5,000 or 50% net of his yearly bonus, through January 2020. [*Id*.] The UST points out that Debtor's $5,000 yearly obligation to his ex-wife ended in January 2020, thereby eliminating this expense, which Debtor lists as $416.67 per month on his updated Schedule J. Debtor's continuing obligation to pay his ex-wife $900 a month through December 2022 will end in less than 24 months, also freeing up funds to pay creditors for the duration of a hypothetical Chapter 13 plan as would be required by *Lanning* and *Seafort* as changes that are known or reasonably certain to occur.

The UST questions Debtor's monthly $900 expense for food and housekeeping supplies. [UST Ex. 11, p. (11-5)]. The figure for this monthly expense in Debtor's Schedule J, filed on November 27, 2018, was $800. [UST Ex. 2, p. (2-48)]. That figure was updated to $900 and provided to the UST in April 2020. [UST Ex. 11, p. (11-5)]. As noted by a court in this district, as "a pole for guidance, the expense figures provided in the 'means test' can be helpful when determining the reasonableness of a debtor's expenses under § 707(b)(3)." *In re Gonzalez*, 378 B.R. at 175. Looking at the allowable living expenses as reflected in the IRS data and contained in the applicable national standards, in 2018, expense

15

figures for food and housekeeping supplies for one person were $377 per month.[4] In 2020, those same expense figures for one person were listed at $430 per month.[5] However, the IRS National Standards also include an embedded allowance for apparel, personal care and other miscellaneous items. Debtor did permissibly claim on his means test form the allowable total for food, housekeeping supplies, apparel, personal care and other miscellaneous items in the amount of $647 at filing. That total increased to $715 in 2020, although Debtor did not submit another means test calculation. Those totals seem appropriate for the average single person household, regardless of how expenditures are allocated among the designated categories. Accordingly, the court finds that Debtor's budgeted amounts of $800 in 2018 and $900 in 2020 are excessive to the extent of approximately $150 a month. As part of the overall totality of the circumstances, the court agrees with the UST that the budgeted expenditures are excessive as argued and could be reduced somewhat without depriving Debtor of necessary food and other household items.[6]

Excluding the excess expense amounts for food and housekeeping supplies of $150 and $416 attributable to the $5,000 annual payment due to Debtor's ex-wife (ending in 2020), Debtor's routine budgeted monthly expenses from 2020 would decrease by $566 a month, from $4,890.26 to $4,324.26. When reasonable and projected actual monthly expenses of $4,324 are compared to his proper net income of either $4,529.65 ($2,753.72 net from updated Schedule I, + $1,360.53 as potential excess amount deducted on account of taxes, + $415.40 deducted on account of 401(k) plan contributions) or $4,373.18 ($2,753.72 from updated Schedule I, + $1,209.06 as potential excess amount deducted on account of taxes, + $415.40 deducted on account of 401(k) plan contributions), depending on how much is deducted on account of taxes, Debtor projects some degree of a Schedule I and J budget surplus, which will increase when his $900 month payment to his former spouse ends. He could use that surplus to repay creditors if he chooses to do so. And that is so before any net bonus amounts Debtor receives are figured into his annual income picture, which, as discussed above, the court finds are fairly considered under § 707(b)(3) as part of the totality of his financial circumstances.

---

[4] This total reflects $345 for food and $32 for housekeeping supplies for one person. https://www.justice.gov/ust/eo/bapcpa/20180501/bci_data/national_expense_standards.htm

[5] This total reflects $385 for food and $45 for housekeeping supplies for one person. https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-food-clothing-and-other-items

[6] Were this the only issue, the court would not be overly concerned that Debtor's expenses for food and housekeeping supplies amounted to an abuse of Chapter 7. Overall, Debtor's budgeted Schedule J expenses are not the biggest problem here. Rather, it is the 401(k) plan contributions, excessive budgeted monthly amounts for tax withholding and the income side of the ledger with respect to receipt of bonuses that directly create abuse in this case.

### B. Other *Krohn* Factors

#### 1. Stability of Future Income

Debtor is 65 years old. He has been steadily employed for 30 years. As counsel's argument that Debtor might lose his job is not supported by the record, the court finds that Debtor has stable future income should he choose to continue working. Over the years this case has been pending, his salary has been stable and increased slightly. As discussed above, the court finds that Debtor will also have income to support himself in retirement should that be the path he takes. On the whole, the court finds Debtor's source(s) of future income to be stable. This factor weighs in favor of dismissal.

#### 2. Eligibility for Adjustment of Debts Under Chapter 13

There is no dispute that Debtor is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, which allows debtors to repay creditors through a confirmed plan administered by a standing trustee. He has regular income and his debts are substantially under the statutory limits of both secured and unsecured debts that are the eligibility standards for proceeding under Chapter 13. *See* 11 U.S.C. § 109(e). Since the filing of this case, general unsecured claims totaling $25,959.29 have been filed. No priority or secured claims were filed. This factor also supports dismissal.

#### 3. Availability of State Law Remedies

No evidence or argument about this factor was raised by either party. The court finds this factor to be neutral and does not inform the outcome of the motion one way or another.

#### 4. Degree of Relief Available Through Private Negotiations

Neither side presented evidence or argument on this issue. For those reasons, the court also finds this factor to be neutral and does not weigh in favor of or against dismissal.

#### 5. Other Factors

Other factors shown by the record also favor dismissal under a § 707(b)(3) totality of circumstances analysis.

Debtor's schedules are not accurately completed as reflective of his true financial condition. *In re Schumacher,* 495 B.R. 735, 740, 746 (Bankr. W.D. Tex. 2013) (debtors have a responsibility to be accurate in their schedules and statements, thus whether a debtor's schedules and means test reasonably reflect his true financial condition is a relevant factor under a § 707(b)(3) totality analysis).

17

Debtor's Schedule I and J budget at filing is inaccurate because of the way he subtracted an annualized income tax obligation arising a from lump sum bonus payment from which applicable taxes were deducted against monthly salary amounts. [UST Ex. 2, pp. (2-45)-(2-48)]. This inaccuracy was repeated on Debtor's updated Schedules I and J. [UST Ex. 11, pp. (11-2)-(11-5)]. *In re Ng,* 477 B.R. at 131-32 (relevant factor under totality analysis is whether debtor's Schedules I and J misrepresent financial condition); *see In re Price,* 353 F.3d at 1139-40 (pre- BAPCPA consideration).

The evidence shows that Debtor has retirement accounts and savings, at least his Estabrook 401(k) account and whatever the source of the income from the Principal Life Insurance payments revealed on income tax returns are derived, [UST Ex. 5, p. (5-1)]. Debtor's response to Q. 21, Part 4 of his Schedule A/B: Property asking him to identify his interests in any "Retirement or Pension Accounts" (with examples given including 401(k) plans) is marked "No." [UST Ex. 2, p. (2-32)]. *In re Aiello,* 284 B.R. 756, 762 (Bankr. E.D.N.Y. 2002) (courts may consider the existence and size of exempt assets such as pensions and retirement plans because they are relevant to a debtor's financial planning and ability to repay creditors). Debtor never amended his Schedule A/B.

Debtor did not schedule any debt or list his former spouse as a creditor on Part 1 of his Schedule E/F. [UST Ex. 2, pp. (2-39)-(2-42)], although he did show a $900 monthly payment for alimony, maintenance or support on his original Schedule J, [UST Ex. 2, p. (2-48)], and eventually added a $416.67 monthly pro-rated payment of the $5,000 annual payment arising out of the divorce decree on his updated Schedule J, [UST Ex. 11, p. (11-5)].

The United States Trustee has also shown that Debtor is preferring one of his general unsecured creditors, the Ohio Catholic Credit Union ("OCCU"). Debtor scheduled OCCU as a general unsecured creditor on his Schedule E/F, with a balance due on a credit card account of $3,300.93. [UST Ex. 2, p. (2-41)]. That approximate balance is confirmed by account statements within UST Ex. 8. [UST Ex. 8, pp. (8-38)–(8-39)]. The Claims Register for this case shows that OCCU did not file a proof of claim for the balance. Nor did Debtor reaffirm that debt. Records for the OCCU credit card account subsequent to commencement of the Chapter 7 case through the statement for March 2020 show that it continues to accrue interest but also that Debtor continues to make monthly payments on the account balance. [*E.g.* UST Ex. 8, pp. (8-113)–(8-114)]. A debtor is permitted to voluntarily repay any debt. 11 U.S.C. § 524(f). In the context of § 707(b)(3), however, the funds Debtor uses to voluntarily pay OCCU would also be available to help pay the other creditors he does not prefer.

The timing of Debtor's Chapter 7 filing was strategically wise albeit perhaps risky. It occurred toward the end of the calendar year in 2018 so that if Debtor thereafter received an end-of-year bonus

from his employer, as he had for years prior, there would be a strong argument that it was not property of the bankruptcy estate and instead would be post-petition income that he would be allowed to keep. As it turns out, that was a correct legal assessment. Debtor won that legal battle against the Chapter 7 Trustee. [UST Ex. 10].

The timing of Debtor's Chapter 7 filing also avoided the sweep of the 2017 bonus payment into the 6- month look back of the means test calculation, which clearly would have resulted in a presumption of abuse. Moreover, Debtor's debts to his former wife were finally on the verge of ending. So the plan to discharge in Chapter 7 approximately $25,542.35 in general unsecured debt while retaining any bonus(es) from his employer and continuing to build undisclosed retirement assets and equity in a lakeside home with the upcoming known expiration of non-dischargeable obligations to his former wife was strategically smart, but in the court's view ultimately abusive of the interests of those creditors he has chosen not to prefer as an element of the totality of circumstances under § 707(b)(3).

C.   **Overall Assessment of Neediness of Debtor**

Debtor has been steadily employed for over 30 years and earns a constant salary that puts him well above the median level for a household of one in the State of Ohio. On top of his steady salary, there is a well-developed 11 year pre- and post-petition history of receiving end-of-year bonusses albeit in varying amounts. Debtor earned taxable wages of $100,172 in 2017. [Am. Stip. Fact 11; UST Ex. 7]. In 2018 and 2019, his social security wages exceeded $114,000 each year. [Am. Stip. Facts 8, 10 and 14]. At first glance, it is hard to reconcile the amount of the income and cash Debtor has access to in order to support just himself with his Schedules I and J, his means test and his inability to repay approximately $25,000 to his unsecured creditors. But once one delves into Debtor's numbers, it becomes apparent that they do not add up to an inability to repay his creditors so much as a different preferred voluntary allocation of his substantial resources.

As explained at length, Debtor's stated deductions from his monthly salary income for taxes are materially overstated because they draw in amounts deducted from lump sum discretionary bonuses that are netted out before payment to him. His monthly food budget is somewhat excessive for one person. He makes voluntary contributions to a 401(k) plan retirement account in increasing amounts through his employer when he has failed to disclose the magnitude of that and at least one other fund from which he draws taxable income.

The court finds that Debtor is not needy and that granting him a Chapter 7 discharge would be an abuse of the provisions of Chapter 7.

## CONCLUSION

Having reviewed the totality of the circumstances of Debtor's financial circumstances as shown in the record, the court finds that the UST met his burden of proof. After considering the relevant factors, the court finds that the totality of these circumstances weighs in favor of dismissing this case under § 707(b)(3) as an abuse. The UST's Motion to Dismiss will be conditionally granted.

**THEREFORE**, good cause appearing,

**IT IS ORDERED** that the Motion of the United States Trustee to Dismiss for Abuse Pursuant to 11 U.S.C. §§ 707(b)(1) & (b)(3) [Doc. # 72] is **GRANTED**; and

**IT IS FURTHER ORDERED** that this case will be dismissed by separate order of the court entered without further notice or opportunity for hearing unless Debtor converts it to Chapter 13 by the date that is 30 days after the date of this order.

# # #